May it please the Court, my name is Susan Williams and I represent Appellant Move, Inc. Keep your voice up, okay? Yes. And I would like to reserve three minutes of my time for rebuttal. The overriding goal of Congress in enacting the Federal Arbitration Act was to ensure judicial enforcement of private arbitration agreements according to their terms. As with any other contract, the party's intentions control. Move did not intend or consent to have its $131 million securities claim arbitrated by a panel chaired by a fraud. Move did not consent to a panel chaired by an individual who fabricated credentials designed to enhance his chances of being chosen, as he was. FINRA recognized that Mr. Frank was not qualified to arbitrate this dispute when it removed him from its roster once his deception came to light. Let me just ask a question. Nothing from the record, as I read it, or the submissions, suggests that the arbitration proceeding would have resulted in a different outcome had Mr. Frank been removed. Why isn't this fatal to your argument that Move's rights were prejudiced by his misbehavior? Move's rights were prejudiced in that Move was entitled to a properly conducted arbitration by a properly constituted panel. It did not receive that. And the question is not would the outcome have been different. The question is were Move's rights to a hearing conducted by a panel of three qualified arbitrators prejudiced when it received an arbitration chaired by an individual who was not qualified to arbitrate the claim at all. Don't you have to say we don't know it might have? In fact, I think you cited a Ninth Circuit case at some point that how do you ever know when somebody is, you know, is a fraudulent judge what difference it would make. But you're actually not saying that. No, we're going to something more fundamental, which is that without regard to the outcome and without regard to what did or did not happen within the four corners of the arbitration, we were entitled fundamentally to a fair hearing by three qualified arbitrators. Would you say this if this was 20 years out? I would. Twenty-five? Yes. What's the best case that supports your statement that you just made? On 20 or 25 years? No, on the fact that you're just because you didn't get what you bargained for in terms of the makeup of the arbitration panel that you're entitled to have the arbitration award set aside. Well, we have a number of cases from the Supreme Court, including Dean Witter Reynolds v. Byrd and Volt Information Services and Stolt-Nielsen that stand for the proposition that as with any other contract, the party's intentions are in control and the contract must be enforced scrupulously. In effect, what the district court did here was this. Isn't your beef with FINRA? It is, but FINRA is immune from suit and the Federal Arbitration Act provides as the remedy for arbitral misconduct, vacatur. So we are seeking the only remedy we are authorized to seek by law. There's no question that you're going to get the award. Your position, though, is, I guess, as you just indicated, is just that you're automatic. You're just because you didn't get the arbitration, because there were the, the, what was his name, this arbitrator? Mr. Frank. Mr. Frank lied, misrepresented his background. FINRA didn't catch it. You later learned about it, that you're entitled to a new hearing. We're entitled to a new hearing, I would submit, because we were entitled to three qualified, honest arbitrators who are required under FINRA's rules to provide a disclosure of their background under oath to verify the accuracy of that information. We were provided that information as part of the FINRA selection process. We had the right to strike four arbitrators, and as the declarations submitted in support of the underlying motion made clear, we would have struck anybody who was being proposed for a public chairperson who was not a lawyer. Did you have some duty to do due diligence about these people? No, we did not. And I think the Ninth Circuit decision cited by the district court in the new Regency Productions case is on point here. We were entitled to rely on the accuracy of the information we received from FINRA. Had there been anything in that information that could have given rise to a suspicion on our part that it was inaccurate, well, perhaps then we would have looked further. But there was nothing in those disclosures that raised a red flag. And as the district court pointed out, even had we decided to check with Southwestern Law School or the California Bar, they would have told us that there was a James H. Frank who graduated from Southwestern in 1973. How did Benjamin Blakeman, who, according to some article, was the attorney who did find it, four years later do it? Apparently, in his arbitration, unlike ours, Mr. Frank said something that gave rise to a concern that he couldn't possibly be a lawyer to say something like that. And I don't know what it was, because all I have are the press reports. And this caused him to call the real Mr. Frank in Santa Barbara, the Southwestern graduate. And that was how he began to unravel the deception. Could you explain to me, just as a matter of background information, when you agreed to submit the arbitration matter to FINRA, and FINRA selected the proposed arbitrators, which you had the right to then strike, as the rules provide for. When you ended up with Frank as one of the arbitrators and the other two, what does FINRA then send you about their background? FINRA sends you the information, I believe it is part of the record. It's in the excerpts of records. They sent us a statement that Mr. Frank had reported experience litigating cases involving injunctive relief. That he was a graduate of 1973, graduated with Southwestern Law School. That he was admitted to the bars of California, New York, and Florida. They also said he had an MBA, which we believe is not true, but we did not get the level of verification of that previous to this. They send you the oath of arbitrator? Pardon? Do they send you the oath of arbitrator? No. That's available online as part of their rules, and we're not aware that he does it. So you can go online and you can look at that he signed the oath of arbitrator. He submitted. That I do not know. I know you can see that FINRA arbitrators are required to sign that oath when they make their disclosures, and of course at the beginning of the arbitration, the first thing Mr. Frank said was, I'm a retired or semi-retired lawyer, and I've reviewed my disclosure statement, and I have nothing to add. I just find it hard to believe that somebody with this much money at stake wouldn't do some investigation, can you even tell me now, okay? He had done 30 some arbitrations. You can make the argument that, all right, that doesn't make him any more qualified, because all of those were fraudulent as well, because he never had a right to do them, misrepresenting who he was, but weren't those arbitrations, wasn't there some record of them? I mean, it just seems like with that much at stake, that somebody would do some investigation before they said, yeah, we'll pick this person. Find out who the, what law, I think we were entitled to rely on the integrity of FINRA as an organization, on the integrity of FINRA's own internal processes, and on the materials that they provided us, and those materials were very detailed. And as this court pointed out in the new Regency case, the level of detail on the disclosure itself could lead someone to believe that it must be accurate. There was nothing in there, unlike, say, the Goldman Sachs case in the third district, that would raise a red flag and create a duty to go beyond it. So, oh, go ahead. Do you know, now that all this has come out, how he's ruled? I mean, did he always rule in favor of the city group kind of defendant? I have looked at all of his awards, and they are almost entirely against the claimant and in favor of the member of FINRA. The other thing that's worth pointing out here is this was, as far as we can tell, far and away the largest matter that was ever before him. And one question that the district court had was, well, you know, you didn't provide any evidence that he actually was biased because of the fact that he was a fraud. You didn't, you, I would question that we need to make that link, because once again, the integrity of the process was so compromised from the inception that nothing that happened after that should really matter in terms of arbitral misconduct. But even if one goes there, at the time this arbitration was conducted in October of 2009, the financial meltdown had been going on for about a year. There had already been a well-publicized consent agreement between the SEC and Citigroup Global, in which Citigroup agreed to repurchase $7 billion worth of small businesses, a settlement not available to move. An award of $131 million would have generated tremendous public interest in publicity and press. And we submit that Mr. Frank, based on what we know about him now, had every reason not to want publicity and not to be in the spotlight. Your time is up, but I'll give you a minute for rebuttal. Thank you. May it please the court, Fred Riley, Jr., for Appelli, Citigroup. There's no dispute that Mr. Frank made misrepresentations. And as the district court noted- He made fundamental misrepresentations. He made misrepresentations, and the district court noted that that was inexcusable and regrettable. But the problem goes to a question that Judge Nelson asked, which is, what is the result? We deal here with an arbitration award, not a court judgment. And under the Federal Arbitration Act, this court has repeatedly made clear that the grounds for vacatur are narrow. And so my friend, Ms. Williams, has to point to a statutory ground that warrants vacatur. And the district court correctly noted that MOVE did not make that showing. Now, I- Has there ever been a case like this before? Well, Your Honor, we submit that there is a case- Where? The Boco case, not the Boco case, the Goldman Sachs case in the Third Circuit. And the district court judge there granted relief, but the circuit reversed on another ground. The circuit reversed on another ground, but did go on to note that it was far from clear on the record before it that there would even be an error, a harmless error, or harmful error under the FINRA rules that the move-in was relying on. And here, if we take- Yes, Your Honor. If there were three fraudulent arbitrators here, what if they discovered a- or, okay, even just one in the middle of the arbitration? Then would they have a right to a new arbitration? Your Honor, the district court addressed this. The district court looked at the FINRA rules, which I would note were not incorporated into the arbitration agreement here. Everybody agreed to be bound by those rules, though. Your Honor, in the submission statement, the parties both- Agreed. But that's not part- They agreed to follow the rules. They did, Judge Paiz. But the question for purposes of Section 1083 and 1084 is what does the arbitration agreement provide? And the arbitration agreement does not include or incorporate the FINRA rules. You don't think that when they agreed, when they signed on to the submission, that they agreed to be bound by the rules of FINRA? No, they did, Your Honor, in the submission statement. But that's not part of the arbitration agreement. And the arbitration agreement is what fixes the arbitrator's powers for purposes of both 1083 and 1084. Back to Judge Bucklow's question, the FINRA rules focus, as the district court noted, on conflict and bias. So the disclosure rules that MOVE relies on are really concerned with relationships, with past work, and with financial interests and other interests that would give an arbitrator some kind of partiality. But surely there was partiality here. How could somebody sit there and know that they're a fraud from A to Z and impartially decide a case? Well, Your Honor, partiality has to do with whether there's a preference for one party or another. And the district court noted that there isn't even a contention, Judge Bucklow, not even a contention here that any of the arbitrators, let alone the two who go unchallenged, whose integrity are unchallenged and whose vote would be sufficient, even under the FINRA rules, which are not incorporated, to support the award here. So the district court properly concluded that on the record before it, in the absence of any argument, that there was any problem with the resulting award, that there was any problem with the conduct of the arbitration. Robertson, were they entitled to an arbitration proceeding before three arbitrators who were qualified to serve under FINRA's rules? Your Honor, the arbitration provision doesn't specify the number of arbitrators. Were they entitled, were the both parties entitled to an arbitration proceeding before three arbitrators who qualified under FINRA's rules? Your Honor, when you say the word entitled, it depends on what you're going to do. No, no, no. Just answer my question. We're under their they agreed to submit this matter to arbitration, correct? Yes, Your Honor. They agreed to be, to follow FINRA's rules, right? They did, Your Honor. And the submission statement. So under FINRA's rules, were they entitled to receive three arbitrators who were qualified under FINRA's rules? FINRA's rules provide for that. And the parties agreed in this. Did they get that? Your Honor. Did they get that? They did not get that. They did not get that. They did not get that, but again. But how do they have the authority to even do what they did? Your Honor, so the Court has made, first I'd like to answer the Court's earlier question, and just to respond a little bit more fully. Because that's the submission statement that incorporates FINRA's rules. And FINRA's rules do provide for a three arbitrator panel. But again, the rules that go to disclosure, that go to the arbitrator's fitness to serve, focus on conflict and bias. And the district court properly noted there's not even a contention of partiality or bias, and so there's nothing on the record that suggests that MOVE didn't get a, yes, Your Honor. Does that trump the fundamental concern that Judge Bucklow was raising just a minute ago? No, I think it actually responds to them. But, Your Honor, well, because if you look at FINRA's rules, FINRA's rules are really focused on whether the determination was impartial and objective. And the district court properly concluded that on the record before it, where there's no argument about the substance of the award, there's no argument about any of the panel's evidentiary rulings. There's no explanation even. The panel that made evidentiary rulings, though, it was Mr. Frank. Your Honor, on the one ‑‑ yes, Frank as the chair had the authority to make evidentiary rulings. It's important to note that the one evidentiary ruling that MOVE addresses in passing, a motion to eliminate, was ruled upon on behalf of all three arbitrators. And indeed, the panel here actually ruled in favor of MOVE on a motion to compel. So the record really does suggest that as the district court concluded, it was an objective, an impartial determination, even if it wasn't perfect. Now, the Judge Pius's question about whether the parties exceeded their powers here, that ground is quite narrow and has a different purpose than the theory that MOVE advances. And this is a point that the district court notes, and we submit is correct on this score. The district court noted that what MOVE is arguing about here and alleging is conduct on the part of a single arbitrator, uncovered years after the fact. That's different from what Section 10A4 is driving at. That ground is driving at situations where you have an arbitration award or you have procedures that the arbitration panel imposes that are so egregiously different from what the arbitration agreement provides that vacatur is warranted. It's the kind of error that would be instantly recognizable. And yet- Isn't it egregious to have someone who probably should be in jail? Look, the district court noted that this was regrettable and inexcusable. But the question for purposes of 10A4 is whether the award or the procedures imposed by the arbitration panel collectively depart so radically from what the parties provided for in their agreement that there ought to be vacatur. And it is important to note that MOVE did not seek to vacate this award in the three years following the arbitration. They raised no questions about the conduct of the arbitration. It was only- You're now getting the question of equidural estoppel. Is that correct? Well, Your Honor, I'm happy to address that ground, too. But I would just say that the theory that MOVE advances, and I think Ms. Williams, my friend Ms. Williams' arguments to the panel here today, confirm that this is really a misconduct theory. It doesn't really fit under 10A4. It fits more comfortably, as the district noted, district court noted, in 10A3. Go ahead, Justice Kagan. Justice Kagan, go ahead. As I read your briefs, you seem to say that under 10A4, courts simply looked at whether the arbitrators irrationally applied the governing law or ruled on issues not submitted for arbitration. Your opposing counsel says because of the deceit, the arbitrators had no power whatsoever. What is your response? Your Honor, 10A4 focuses on the arbitrator's agreement, the arbitration agreement. How did the parties structure the arbitration? What do the terms of the arbitration agreement provide? And here, this arbitration agreement at first doesn't incorporate FINRA rules. And so MOVE is seeking to go beyond the FINRA rules here. It's not that. I don't understand that argument at all. I'm sorry. Beyond the arbitration agreement. They get what FINRA rules provide for. Judge Bias. Three arbitrators who were qualified under FINRA's own rules to serve as arbitrators, and this one fellow was on the list to serve as chairman of the arbitration. Judge Bias, I misspoke. They go, they seek to go beyond the arbitration agreement itself. The actual terms of the arbitration agreement. What they're seeking instead is to rely on FINRA rules that aren't part of the arbitration agreement. There are some. So they don't account for anything? No, they are, Your Honor. They're just not of the part of the agreement to arbitrate. It's not like a case. I can't find that argument. I don't find that argument at all persuasive. So, Judge Bias, if you look at Lagstein, for example. If you find that, which is the argument you keep making, then we should reverse? Your Honor, I just want to note that Lagstein is an example of a case where you did have an arbitration provision that expressly incorporated other arbitration rules. But this arbitration provision doesn't provide for that. Now, as the district court noted, even if you treat the FINRA arbitration rules as part of the agreement to arbitrate, there still isn't an egregious departure from the party's arbitration agreement because those rules focus on conflict and bias. Because those rules provide that a two-arbitrator majority can issue the award in this case. I thought – wait a minute. So I thought that suppose during the course of the hearing one of the arbitrators got sick and was unable to proceed. Don't our parties under the FINRA rules have to consent then to the entry of an award by two arbitrators? Well, Your Honor, the rules do provide that a two – that a majority of arbitrators and – But they provide for consent. The parties have to agree to that, right? Your Honor, I – Your Honor, I believe that's right. I haven't looked at that particular rule. But I would note that the ground for removing an arbitrator, Rule 12407, also focuses on conflict and bias. So even if you treat the FINRA rules as part of the agreement to arbitrate, the district court properly concluded that there just isn't on this record, on the arguments that were presented to it, and on the facts that were presented to it, grounds for vacatur under 10A4. With respect to Judge Nelson's question, if I may quickly on equitable tolling, if you look at the text of Section 12 and look at that text in light of this Court's precedent in Lafarge, Section 12 and the 3-month period to bring a vacatur motion is fundamentally inconsistent with equitable tolling. The language is strict, as this Court noted in Lafarge. The other circuits that have interpreted that language have read it to be inconsistent with the application of equitable tolling. Lafarge rejected an effort to get around that 3-month period under Rule 60B for newly discovered evidence. That's very similar to equitable tolling. And the Court rejected it. So we submit that this motion was untimely from the beginning. And this gets to Judge Bucklow's question about whether this vacatur motion could have been brought 10 years from now, 15 years from now. Judge Posner correctly noted that that's the fundamental problem with recognizing a judge-made exception to that 3-month period or applying a rule-based exception to that 3-month period. It was. It was, Your Honor. But the explanation we submit is ñ applies here and gives good reason to find that this motion was untimely. Judge Nelson, it looks like you had a question. I realize your time is gone, but your briefs seem to indicate that to apply equitable tolling that your opposing counsel would have to show prejudice. How would one possibly know the influence of the chair of the board and the other two arbitrators sufficiently to show prejudice? Your Honor, there's no effort here to link up the misrepresentations by Mr. Frank, the fact that he was not a lawyer, to anything that went wrong in the arbitration. There's no criticism of the award. There's no criticism of any rationale that would support it. There's no challenge to an evidentiary ruling by the panel. There's no challenge to the conduct of an arbitration. So there isó The normal course, you know, Mr. Rowley, in the normal arbitration proceedings, it's a rare day that an arbitration award gets set aside. Judge Piusó A rare day. My business is, you know, I mean, they have no choice in this particular instance, but, you know, arbitration isn't all that people think it is in the end. But, Judge Pius, I think the response to Judge Nelson's point is just that there isn't even a theory that's been put on the table as to what went wrong and what might have made a difference here. That's what the district court, we submit, was reacting to. And this is not like a Section 10a2 situation. If the contention is that there was evident partiality on the part of a judge or corruption on the part of an arbitrator, and that means bias or some kind of conflict of interest, just like the FINRA rules, I would note it's a different situation. The statute provides for corruption or evident partiality in the part of the arbitrators or any of them. So any single arbitrator who shows evident partialityó But Judge Buckla has aó Yes, Judge Buckla. Do you not think that was corrupt? Your Honor, that's not a ground that MOVE has invoked here. And if you look at the text of the statute, it's really focused on something else. It's focused on partiality and conflict, conflicts of interest. And as the district court noted, there's no contention of that here at all. Okay. All right, Mr. Allen, we'll let you go over your time. Let's hear from a rebuttal. Two points. First, as to Section 10a.4, the partyówe did have a contractual right to adherence with FINRA's rules and policies, both as a third-party beneficiary of Citigroup's contract with FINRA and through the supplementation of the party's client agreement with the submissionóuniform submission agreement. Those policyóthose rules were not followed. And as this Court pointed out, in the Western Employers case, arbitrators can exceed their powers under Section 10d when they fail to meet their obligations as specified in a given contract. But moreóbut more importantly, on the question of arbitral misconduct under 10a.3, I'd just like briefly to remind this Court of this Court's statement in the Schmitz v. Zilvedi case cited in the briefs. The policies of 9 U.S.C. Section 10 also support the notion that the standard for nondisclosure cases should differ from that used in actual bias cases. In a nondisclosure case, the integrity of the process by which arbitrators are chosen is at issue. Whether the arbitrator's decision itself is faulty is not necessarily relevant. And this is not only not a nondisclosure case. This is an affirmative misrepresentation case. It is an extremely odd fact pattern, and an attempt to ground it in cases relating to actual bias or perceived bias makes it more difficult to address. Judge Buckle had a question. Yes, I'm sorry. What your opponent has said over and over, I think you need to address. Despite all the problems that we've discussed here, what makes you think you would prevail if you did this again? I mean, is there any basis you really haven't objected to the award in terms of its substance or to evidentiary rulings? Do we have any reason to think that there would be any difference? Your Honor, we do. We think that the result might well be different, although, of course, we cannot know. We cannot guarantee it. Had we been able to arbitrate this matter before a panel chaired by an experienced attorney, it involved complex legal issues involving the obligations of a broker to its clients, it involved transactions which, as we all know, there were a lot of things going on in the late 2000s that people don't understand even now. You know, I've read the big short, and I don't understand any of it. A certain level of education and rigor was what was required here. It was not received. And, in fact, we had someone whose real goal was, we believe, to stay under the radar and to avoid scrutiny. And so for those two reasons, we believe that there is at least a reasonable probability of a different outcome. Okay. Thank you.
judges: D.W. Nelson, Paez, Bucklo